FILED
2010 Feb-25 PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

LAFAYETTE TEXACO, INC.,      *
MIKE MCCULLERS and STACI      *
MCCULLERS,      *

Plaintiffs,      *

v.      *      Case No. 3: 08CV 406
     *
KEITH SMITH, JASON JANES,      *      JURY TRIAL DEMANDED
MIKE BURKS, MARK      *
PARISH, MOORE OIL COMPANY, INC.*
     *
     *
Defendants.      *

RECEIVED

2000 MAY 29 P 4: 25

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

### COMPLAINT

### STATEMENT OF JURISDICTION

This Court has jurisdiction over the subject matter of this Complaint, pursuant to

28 U.S.C. 1331 as Count I arises under the laws of The United States.

### STATEMENT OF PARTIES

1.    Plaintiff Lafayette Texaco, Inc. is a domestic corporation with its principle

business in Chambers County, Alabama. Plaintiffs Mike and Staci McCullers are both

residents of Tallapoosa County, Alabama.

2.    Defendant Keith Smith, upon information and belief, is a citizen of the State of

Alabama and a manager with Defendant Moore Oil Company, Inc.

3.    Defendant Jason Janes, upon information and belief, is a citizen of the State of

Alabama.

4.    Defendant Mike Burkes, upon information and belief, is a citizen of the State of

Alabama.

5.     Defendant Mark Parish, upon information and belief, is a citizen of the State of Alabama.

6.     Defendant Moore Oil Company, Inc. is a domestic corporation doing business in Chambers County, Alabama.

## STATEMENT OF FACTS

7.     Plaintiffs reallege paragraphs 1-6 as if set forth here in full.

8.     From January 2006, through the present, the Plaintiffs were and are in the business of the retail sale of, among other things, gasoline.

9.     Defendant Moore Oil Company, Inc. is the provider of fuel to the Plaintiffs.

10.     The individual Defendants are all employees of Defendant Moore Oil Company, Inc.

11.     From January 2006 through the present, the individual Defendants have been entrusted by Defendant Moore Oil Company, Inc. with delivering the agreed upon amount of fuel to the Plaintiffs.

12.     During said time period, the individual Defendants have stolen and/or converted said fuel, and failed to provide the full amount of fuel which was agreed upon between the Plaintiffs and Defendant Moore Oil Company, Inc.

13.     Notwithstanding the fact that the Plaintiffs have not received all of the fuel they have contracted to receive by the Defendants, the Defendants have billed the Plaintiffs, consistently over the past two years for the full amount of fuel contracted for, even though said amount was not delivered to the Plaintiffs.

14.     Additionally, Plaintiffs and Defendant Moore Oil Company, Inc. have an agreement, which was originally between the Plaintiffs and Price Oil Company, which

filed for bankruptcy protection and ceased operations. Defendant Moore Oil Company, Inc. assumed the duties of the Price Oil contract and is bound by all of its terms.

15.     In said contract, Defendant Moore Oil Company, Inc. has agreed to charge the Plaintiffs a certain price for fuel and freight.

16.     Notwithstanding this, Defendant Moore Oil Company, Inc. has continued to charge a different and higher amount to the Plaintiffs for the fuel, and Defendant has continued to send the Plaintiffs invoices for payment, by use of the United States Mails, based upon the incorrect pricing.

17.     As a result of the Defendants' theft, conversion, false invoicing, and breach of contract between the parties, the Plaintiffs have suffered significant damages.

**COUNT I**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**

18.     Plaintiffs reallege paragraphs 1-17 as if set forth here in full.

19.     From January 2006 through the present, Defendant Moore Oil Company, Inc. sent false invoices to the Plaintiffs for payment for fuel it did not receive. Furthermore, Defendant included charges which were not agreed upon between the parties.

20.     This conduct by Defendant Moore Oil Company, Inc. was a scheme or artifice to defraud the Plaintiffs out of money.

21.     Defendant Moore Oil Company, Inc. perpetrated this fraud through a pattern of racketeering activity, in violation of 18 U.S.C. 1341, in that Defendant Moore Oil Company, Inc. used or caused the mails of the United Stated States to be used in furtherance of this scheme or artifice to defraud, on more than one occasion.

22.     Alternatively, Defendant Moore Oil Company, Inc. used or caused the mails of the United States to be used in furtherance of this scheme or artifice to defraud Plaintiffs, on more than one occasion.

23.     Alternatively, Defendant Moore Oil Company, Inc. perpetrated this fraud trough a pattern of racketeering activity, to wit, it violated 18 U.S.C. 1343, in that Defendant Moore Oil Company, Inc. used or caused electronic or other wired means to be used in furtherance of this scheme or artifice to defraud Plaintiffs on more than occasion.

24.     Defendant Moore Oil Company, Inc. received income for the enterprise through a pattern of racketeering activity.

25.     This activity effects interstate commerce.

26.     These activities on the part of Defendant Moore Oil Company, Inc. constitute a violation of 18 U.S.C. 1962(a).

27.     Plaintiffs were injured in their property as a result of this conduct.

        **WHEREFORE,** Plaintiffs request damages commensurate with 18 U.S.C. § 1964.

**COUNT II**
**CONVERSTION**

28.     Plaintiffs reallege paragraphs 1-27 as if set forth here in full.

29.     From January 2006 through the present, the Defendants converted the property of the Plaintiffs, to wit, fuel which was purchased by the Plaintiffs from Defendant Moore Oil Company, Inc.

30.     Plaintiffs have demanded the return of said property and/or just compensation for said property, and the Defendants have unlawfully refused to make said compensation.

31.     Plaintiffs allege that Defendant Moore Oil Company, Inc. is also liable for this conversion because it had notice or, alternatively, it negligently failed or refused to prevent said conversion.

32.     Plaintiffs were damaged as a result of the conversion of this property by the Defendants.

33.     Plaintiffs claim all available damages at law as a result of the conversion by the Defendants.

34.     Plaintiffs claim punitive damages of the Defendants because of the Defendants' willful and oppressive conduct.

    **WHEREFORE**, Plaintiffs demand judgment against Defendants in the appropriate sum to be determined by a jury, plus interest at 6% for the entire period that the Defendants were stealing said fuel from the Plaintiffs.

## COUNT III
## THEFT

35.     Plaintiffs reallege paragraphs 1-34 as if set forth here in full.

36.     This action is commenced under Code of Alabama 1975, § 6-5-370.

37.     The conduct of the Defendants, described earlier in this Complaint, amounts to theft, the value of which would render this conduct a felony under applicable Alabama Law.

38.     Pursuant to the above referenced statutory section, Plaintiffs commence this civil action for this theft.

39.     Plaintiffs contend that Defendant Moore Oil Company, Inc. is also liable because it had notice or, alternatively, it negligently failed or refused to prevent said theft.

40.     As a result of the theft by the Defendants, Plaintiffs suffered damages.

41.     Plaintiffs claim all available damages under applicable Alabama Law as a result of the Defendants' theft.

42.     Plaintiffs claim punitive damages of the Defendants because of the Defendants' willful and oppressive conduct.

**WHEREFORE**, Plaintiffs demand judgment against Defendants in the appropriate sum to be determined by a jury, plus costs.

## COUNT IV
## BREACH OF CONTRACT

43.     Plaintiffs reallege paragraphs 1-42 as if set forth here in full.

44.     In January of 2006, Defendant Moore Oil Company, Inc. was bound by an agreement between Plaintiffs and Price Oil Company discussed earlier in this complaint, a copy of which is attached hereto as Exhibit "A".

45.     Defendant Moore Oil Company, Inc. breached said agreement by invoicing, charging, and collecting monies from the Plaintiffs under terms different than said contract and for collecting money for fuel which was not delivered to the Plaintiffs by the Defendant.

46.     Plaintiffs performed all conditions precedent under said contract, including the paying of all fraudulent invoices by the Defendant.

47.     Plaintiffs claim a reasonable attorney's fee of Defendant pursuant to the contract.

48.     Plaintiffs suffered damages a result of the Defendant's breach of contract.

49.     Plaintiffs claims all damages available under applicable Alabama Law as a result of the Defendant's breach of contract.

WHEREFORE, Plaintiffs demand judgment against Defendants in the appropriate sum to be determined by a jury, plus costs and any other sums permitted under Alabama Law.

## COUNT V
## NEGLIGENT/ WANTON SUPERVISION AND TRAINING

50.     Plaintiffs reallege paragraphs 1-49 as if set forth here in full.

51.     Defendant owed a duty to the Plaintiffs to properly supervise and monitor its drivers, to insure that the Plaintiffs received all of the fuel the Defendant billed it for and accepted payment for.

52.     Upon information and belief, all of the trucks driven by the individual Defendants who were committing the theft referenced earlier in this Complaint, had GPS or other monitoring devices, wherein the Defendant should have known that its drivers were not delivering the proper amount of fuel to the Plaintiffs. Furthermore, Defendant Moore Oil Company, Inc. received earlier complaints about inventory discrepancies from its customers.

53.     Defendant breached its duty to the Plaintiffs by failing to properly monitor and supervise its employees, when it had the means to do so, and industry custom required that it do so. Furthermore, Defendants acted in reckless disregard to the fact that Plaintiffs were being stolen from.

54.     The theft by the individual Defendants was so blatant as to give Defendant Moore Oil Company, Inc. notice that said theft was taken place.

55.     Defendant Moore Oil Company, Inc.'s failure to uncover and correct the theft is a further breach of duty owed to the Plaintiffs as its customer.

56.     As a proximate result of the Defendant's negligence and/or wantonness, Plaintiffs have suffered damages.

57.     Plaintiffs claim all available damages under applicable Alabama Law as a result of the Defendant's negligence and/or wantonness, including punitive damages.

        **WHEREFORE,** Plaintiffs demand judgment against Defendants in the appropriate sum to be determined by a jury.

## COUNT VI
## FRAUD

58.     Plaintiffs reallege paragraphs 1- 57 as if set forth here in full.

59.     From January 2006 through the present, Defendant Moore Oil Company, Inc. represented to the Plaintiffs that it would deliver agreed upon amounts of fuel to the Plaintiffs.

60.     Defendant Moore Oil Company, Inc. represented to the Plaintiffs that it would properly invoice the Plaintiffs for the fuel that was delivered.

61.     Furthermore, Defendant represented to the Plaintiffs that it would charge the Plaintiffs, based upon the pricing in the assumed Price Oil contract with the Plaintiffs.

62.     All of the above-referenced representations by the Defendant Moore Oil Company, Inc. were false, and Defendant knew they were false, or, were false, and were recklessly made by Defendant, or were false and made by Defendant by mistake, but with the intention that Plaintiffs should rely upon them.

63.     Plaintiffs reasonably relied on said representations by continuing to do business with Defendant Moore Oil Company, Inc. and by continuing to pay all of the false invoices which contained the over charging.

64. As a proximate result of Defendant's fraudulent conduct, Plaintiffs suffered damages.

65. Plaintiffs claim all applicable damages available under Alabama Law.

66. Plaintiffs claim punitive damages of the Defendants due to Defendant's fraudulent conduct.

**WHEREFORE**, Plaintiffs demand judgment against Defendants in the appropriate sum to be determined by a jury, plus costs.

Respectfully submitted this the 29ᵗʰ day of May, 2008.

James B. Douglas, Jr.
Attorney for Plaintiffs
P.O. Box 1423
Auburn, AL  36831-1423
(334) 821-1596
ASB 8935-u83j

Patrick C. Davidson
122 Tichenor Ave.
Auburn AL 36830
(334) 501-2985
ASB 4602-A43P

## JURY DEMAND

Pursuant to rule 38 of the Federal Rules of Civil Procedures, Plaintiffs demand trial by struck jury.

Respectfully submitted this 29ᵗʰ day of May, 2008.

James B. Douglas, Jr.

Exhibit "A"

PRICE OIL, INC.
WHOLESALE DEALER AGREEMENT FOR MOTOR FUELS

Price Oil, Inc. ("Seller"), and James M. McCullers and Staci L. McCullers ("Purchaser") doing business as   LafayetteTexaco, enter into this Wholesale Dealer Agreement for Motor Fuels.

1.    TERM.

This Agreement shall remain in full force and effect from 1st day of Feb. , 2002 , ("Effective Date") and expire on the 1st day of Feb. , 2012

2.    PRODUCTS AND QUANTITIES.

A. Seller agrees to sell and deliver or cause to be delivered and Purchaser agrees to buy, receive and pay for motor fuels of the kind and quality marketed by Seller at the time and place of delivery in quantities specified from time to time by Purchaser as set forth in the attached Exhibit A, entitled "Purchase Quantity Schedules." As to each motor fuel, Purchaser agrees to purchase for each monthly and yearly period of the term of this Agreement not less than the minimum quantity and Seller shall not be obligated to sell more for any such monthly and yearly period than the maximum quantity. To the extent practicable, Purchaser agrees to take delivery of all motor fuels on a ratable basis.

B. Purchaser shall make available for sale to its customer representative quantities of all grades of gasoline offered for sale by Seller, and shall require that all grades of gasoline offered by Seller be made available to the motoring public at the Texaco-branded retail facility owned, operated and/or served by Purchaser, unless otherwise granted an exception in writing by Seller.

C. Seller shall have the right to substitute different kinds, qualities, names or grades of Texaco-branded motor fuels in replacement of any or all of those specified in this Agreement and Purchaser shall be obligated to accept delivery of such replacement motor fuels. If a substitution is made, any minimum and maximum quantities provided for the original motor fuel shall apply to the replacement motor fuel. Thereafter, Seller shall be relieved of any further liability or obligation to sell and deliver or cause to be delivered the original motor fuel. Notwithstanding anything in this Agreement to the contrary, Seller reserves the right at any time to discontinue supplying any particular kinds, quality, name or grade of Texaco-branded motor fuel.

D. The remedies provided to Seller herein shall be cumulative with and in addition to any repayment obligations Purchaser may incur under the terms of any other agreement executed between Seller and Purchaser.

3.    DELIVERY, TITLE AND RISK OF LOSS.

A. Orders for motor fuels must specify quantities equivalent to a full truck, barge or tank car transport, whichever is the normal method for receipt or delivery of the motor fuel. Seller may make delivery in smaller quantities. Seller shall deliver or cause to be delivered motor fuels only in such amounts and at such times as Seller determines are available for delivery. Title and risk of loss shall pass to Purchaser at the fill tube connection into Purchaser's storage equipment.

4.    DELIVERY METHODS.

A. Approximate Quantities. Deliveries within ten percent (10%) of amounts called for under this Agreement shall not be a breach of this Agreement by Seller. Purchaser shall pay for only the actual amounts delivered. Except in situations of force majeure or impracticality, Seller shall give Purchaser at least 30 days prior notice of permanent changes in the delivery method used by Seller.

5.    PAYMENT TERMS AND CREDIT REQUIREMENTS

A. Purchaser shall pay Seller via Seller's Electronic Fund Transfer (EFT) System in accordance with Seller's terms of payment (as shown in the Terms of Payment for Motor Fuels letter) in effect on the date of delivery. If Seller does not extend credit or approve Purchaser's payment via EFT, Seller may in its sole discretion and without prior notification require Purchaser (i) to pay Seller via bank wire transfer prior to time of delivery or at such time and place or method as Seller may designate from time to time, (ii) to provide Seller a cash deposit, or (iii) to provide Seller an Irrevocable Bank Letter of Credit sufficient to Seller. Purchaser shall have and maintain sufficient funds to cover payment and shall not issue payment without sufficient funds to cover such payment. In addition to any other remedies available to Seller for Purchaser's failure to comply with this Section, Purchaser shall pay to Seller a reasonable administrative fee for each instance of payment which does not have sufficient funds for coverage.

B. Seller may extend credit to Purchaser at Seller's sole discretion, which credit may be withdrawn or modified at any time, without prior notification to Purchaser. If Seller extends credit to Purchaser, all payments to Seller shall be made via Seller's Electronic Fund Transfer (EFT) System or in such other form and payable at such location as may be acceptable to Seller. When requested by Seller, Purchaser agrees to provide, and cause any guarantor of Purchaser to provide, periodic financial statements, in addition to applicable notes and schedules, and to furnish reasonable collateral, guarantees, and other security to support an extension of credit. Purchaser's failure to provide such financial information or security requested by Seller may result in Seller's reducing, withholding or termination of credit privileges. All statements made and materials furnished by Purchaser shall be true, accurate and not misleading. Purchaser shall not fail to disclose information to Seller, its agents or employees, concerning any material fact for the purpose of inducing Seller to issue any credit memorandum to Purchaser or to any other party acting in concert with Purchaser. Purchaser shall not allow any attachment, garnishment, execution or other legal process or proceeding to be levied or commenced by anyone other than Seller against or involving Purchaser's business assets or any other financial impairment to exist as to such assets which is not removed, cured, bonded or satisfied within forty-five (45) days from the date of such levy, execution or commencement of proceedings. If Purchaser's ability to pay or credit worthiness shall deteriorate in Seller's sole judgment, Seller may, without prejudice to any remedy reserved in this Agreement or other lawful remedy, defer shipment until payment is made, demand cash payment, or terminate this Agreement pursuant to Section 8. Purchaser acknowledges that Seller's reducing, withholding or terminating of credit privileges does not constitute a constructive termination of this Agreement, nor does it relieve either party of any duties or obligations under this Agreement or any other obligation or agreement.

C. Purchaser shall pay a financing charge on any balance not paid when due at an annual rate determined by Seller not to exceed the maximum rate permitted by applicable law, prorated daily on the basis of 360-day year. Seller's right to collect a financing charge for Purchaser's failure to pay for Texaco-branded motor fuels, or any other obligations, when due does not operate as a waiver of Seller's rights of termination under the Termination by Seller Section. Purchaser's obligation to pay for delivered products, or any other obligations, shall not be subject to offset for any claims against Seller except for non-delivery of products charged to Purchaser.

D. If Purchaser fails to comply with the terms of this Section, all amounts owed to Seller for any obligation shall immediately become due and payable and Seller shall be the right, but not the obligation, (i) to set off or equitably recoup amounts due from Purchaser against any amount due to Purchaser, up to the total amount outstanding, and (ii) to suspend making all further delivery of all products until all indebtedness is paid in full. Seller's pursuit of any one remedy shall not preclude its pursuit of any other remedy provided by law, nor shall Seller's pursuit of any remedy constitute a forfeiture or waiver of any amount due Seller or any damage accruing to Seller to incur costs to collect or to enforce or defend any of Seller's rights or remedies hereunder. Purchaser agrees to pay any and all reasonable costs associated with such action, including but not limited to reasonable attorney's fees and court costs.

E. If at any time during the term of this Agreement Purchaser disputes the amount payable to Seller for any of the Texaco-branded motor fuels delivered or deliverable hereunder, or any other obligations, Purchaser shall pay the amount Purchaser reasonably believes is due in accordance with Seller's terms as stated on the disputed invoice(s) and notify the Seller in writing of the detail of the dispute

within ten (10) days. Purchaser agrees that failure to do so within ten (10) days shall be considered as an admission by Purchaser that Seller's invoices are correct. Purchaser shall comply with the terms of any reclamation notice issued to Purchaser by Seller under applicable law in the event Purchaser fails to make any payment when due.

6.      PRODUCT STEWARDSHIP AND QUALITY.

A. Purchaser will not allow or permit any Texaco brand motor fuels to be sold as Texaco brand motor fuels by Purchaser or its Retail Facilities which are mislabeled, misbranded or contaminated. Purchaser will not sell or allow Texaco brand motor fuels of a lower grade to be sold as Texaco brand motor fuels of a higher grade. Purchaser will not commingle any substance with a Texaco brand motor fuel and then sell it as a Texaco brand motor fuel. Purchaser will not permit the commingling of leaded with unleaded motor fuel or the sale of motor fuel under a Texaco label or designation which is in fact not a Texaco brand motor fuel or is a grade of Texaco motor fuel other than that described by the label or designation or has an octane level other than that provided on the label or designation.

B. Purchaser will allow Seller, its employees, agents or designees to enter Purchaser's place of business at any time during hours of operation and without notice to obtain such samples or conduct such tests or inspections as may, in Seller's judgment, be reasonably required to determine that Purchaser is complying with its obligations under this Agreement and with all applicable federal, state and local laws, rules, regulations, orders and guidelines. Purchaser shall obtain from the operators of the Retail Facilities the written contractual right for Seller, Purchaser and the employees, agents or designees of each, to enter such Retail Facility at any time during hours of operation and without notice to obtain such samples or conduct such tests or inspections as may, in Seller's or Purchaser's judgment, be reasonably required to determine that such Retail Facility is complying with the aforesaid obligations. Purchaser shall cooperate with Seller in any investigation relating to Purchaser's obligations hereunder.

C. Neither Purchaser nor its customers shall make any use of a product sold under this Agreement other than that intended by Seller. In the event of product misuse, Purchaser shall immediately notify Seller in writing and shall cease all sales of the applicable product to such customer. Upon Seller's request, Purchaser shall promptly provide to Seller an accurate listing of the types of uses made of products purchased by Purchaser under this Agreement. In response to such requests, Purchaser shall make reasonable efforts to determine the uses of products sold by Purchaser or Purchaser's customers.

D. Purchaser shall comply with Seller's guidelines for the Handling of Motor Fuels contained in Exhibit B or the current guidelines which may be substituted from time to time. Purchaser shall maintain and ensure the integrity and sterility of all underground and above-ground storage tanks so as to preclude any water or other infiltration. Seller shall not be liable nor shall Seller reimburse any customer of Purchaser for damages, losses or repairs that result from water or otherwise contaminated motor fuel dispensed into a vehicle by Purchaser or its employee unless it can be clearly proven that Seller negligently caused such water or contamination.

E. Purchaser warrants that Purchaser and the Retail Facilities shall comply with the requirements of this section.

7.      ENVIRONMENTAL COMPLIANCE.

Purchaser shall not engage in any practice in violation of any federal, state or local laws, regulations or ordinances, now in existence or which may hereinafter be enacted or promulgated from time to time (collectively referred to as "Applicable Laws"), relating to the storing, handling, distribution and dispensing of motor fuels, but shall operate its business in all respects and at all times in full compliance with applicable laws. Purchaser represents and agrees that Purchaser shall act in good faith to become aware of such applicable laws and shall ensure that its resale customers do the same.

8.      TERMINATION OR NONRENEWAL BY SELLER.

Seller may terminate this Agreement or fail to renew the franchise relationship with Purchaser on any ground set forth in the Petroleum Marketing Practices Act, 15 U.S.C. 2801, et seq., as amended from time to time, cases decided under the Act, or any successor act or other statute affecting Seller's rights of termination and nonrenewal. For the purpose of illustration but not limitation, it is specifically understood by Purchaser that Seller considers the events listed in subsections (a) through (n) of this Section 8 both reasonable and of material significance to the franchise relationship and, upon the occurrence of any such event, that it would be reasonable for Seller to terminate this Agreement or fail to renew the franchise relationship:

A. Purchaser's failure to purchase at least the minimum quantities of each motor fuel set forth in Exhibit A for any yearly period and as otherwise required in Section 2;

B. Purchaser's failure to pay to Seller in a timely manner when due all sums to which Seller is entitled (whether or not such sums are owed under this Agreement) or its failure to comply with any other provision contained in Section 5;

C. The commencement of bankruptcy or insolvency proceedings by or against Purchaser or Purchaser becoming insolvent;

D. Purchaser's failure to comply with any of the provisions of Section 6 pertaining to product stewardship and quality or Section 7 pertaining to environmental compliance;

E. Seller's election to withdraw from marketing of motor fuels in the area supplied by Purchaser as set forth in Section 11;

F. Purchaser's failure to comply with Section 12 pertaining to Seller's identification and Minimum Standards;

G. Purchaser's failure to comply with any of the training requirements set forth in Section 13;

H. Purchaser's failure to take reasonable action to satisfy customer complaints as set forth in Section 14;

I. Purchaser's failure to comply with any of the provisions of Section 15 or any credit card or debit card agreement between the parties;

J. Purchaser's failure to comply with the requirements set forth in Section 19 pertaining to adherence to all applicable laws and regulations, oversight, testing and sampling;

K. Purchaser making an assignment or delegation of this Agreement without the prior written consent of Seller in violation of Section 22, or attempting to do so;

L. Except as provided in Section 22 below, Purchaser dying or suffering continuing severe physical or mental disability of at least three (3) months duration which renders Purchaser unable to perform all of its obligations under this Agreement;

M. Purchaser's failure to secure and maintain insurance coverage or financial compliance as provided in Section 24;

N. Purchaser's failure to comply with any other provision of this Agreement which is both reasonable and of material significance to the franchise relationship between Seller and Purchaser.

9.     INDEPENDENT STATUS OF PURCHASER.

A. No provision contained in this Agreement shall be construed in such a way as to reserve, give or grant to Seller any right to manage or control the day-to-day business of Purchaser or any operator of the

Retail Facilities. Purchaser and operators of the Retail Facilities have complete control over and sole responsibility for the operation of the Retail Facilities. Neither Purchaser nor the operators of Retail Facilities nor its or their employees or agents shall be considered joint venturers, partners, agents or employees of Seller for are and shall at all times be independent business entities that are free to select their customers; set their own selling prices and terms of sale; implement health and safety measures, policies and procedures; and generally conduct their business as they determine subject to the obligations set forth in this Agreement. Purchaser and the operators of Retail Facilities shall at all times remain solely responsible for all aspects of safety and security of the Retail Facilities.

B. Purchaser and the operators of Retail Facilities have the sole right to hire, control, supervise and discharge their employees and agents, and Purchaser and the operators of Retail Facilities shall have the sole right to control the performance of and the sole responsibility for any maintenance or automotive repair work performed at Retail Facilities.

10.   SECURITY.

Purchaser shall operate and maintain and shall require the operators of Retail Facilities to operate and maintain the Retail Facilities in a secure manner. Purchaser and the operators of Retail Facilities shall have and maintain complete control over and sole responsibility for the security of the Retail Facilities. All decisions related to security shall be the sole responsibility of Purchaser and the operators of the Retail Facilities. All security measures and devices shall be acquired at Purchaser's or the operator's of Retail Facilities sole discretion and expense and maintained by Purchaser or the operator of Retail Facilities.

11.   MARKET WITHDRAWAL.

In the event Seller elects to withdraw from marketing of motor fuels in a relevant geographic market area of which Purchaser is located, Seller may terminate or nonrenew this Agreement at any time without further liability in compliance with the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as may be amended from time to time. Upon receipt of notice of termination or nonrenewal, Purchaser may terminate this Agreement at any time prior to the expiration of said one hundred eighty (180) day period by entering into a mutual cancellation with Seller.

12.   SELLER'S IDENTIFICATION AND MINIMUM STANDARDS.

A. Purchaser shall conduct its business to reflect favorably on the parties and to further promote public acceptance of Texaco-branded motor fuels and Texaco trademarks, brand names and trade dress (collectively "Identification of Texaco"). Purchaser shall have the right to use certain Identification of Texaco, but only for the purpose of properly identifying and advertising Texaco brand motor fuels handled by Purchaser, and in a manner and form satisfactory to Seller in Seller's sole judgment. Purchaser agrees not to claim any right, title or interest in the Identification of Texaco. Purchaser shall not use the word "Texaco" in the name of any corporation, partnership or other legal entity. Purchaser shall not use Texaco's trademarks or the word "Texaco" in Purchaser's trade style if such use is likely to create the impression that Purchaser's business is owned or operated by Texaco or its affiliates.

B. Purchaser shall conduct its operations and shall cause the operations of the Retail Facility to be conducted in accordance with Texaco's image standards described in the Texaco Retail Facility Standards and Appearance Manual, current edition ("the Standards Manual") (the "Minimum Standards") as may be changed or modified by Texaco from time to time upon reasonable notice to Purchaser. Should Purchaser desire an exception to any of the Minimum Standards, Purchaser must obtain the prior written approval of Texaco.

C. To complete the transition of the Retail Facilities to the Minimum Standards set forth in the Standards Manual, the following requirements shall apply to all such Retail Facilities:

i. All Retail Facilities proposed by Purchaser and approved by Texaco branding with the Identification of Texaco which are newly constructed on or after July 1, 1998 shall comply with the "New Construction Standards" set forth in the Standards Manual

ii. All Retail Facilities in existence before July 1, 1998 which are not Texaco-branded, but are submitted to Texaco with a request for authority to brand after July 1, 1998, shall comply, at a minimum, with the "Class C Retrofit" specifications set forth in the Standards Manual.

iii. All Retail Facilities which were constructed and approved by Texaco branding with the Identification of Texaco prior to July 1, 1998 shall comply, at a minimum, with the "Class C Retrofit" specifications set forth in the Standards Manual by December 31, 2002.

D. If the Retail Facility approved for branding by Texaco fails to meet the Minimum Standards in accordance with the schedule set forth above, Seller will notify Purchaser in writing to bring the Retail Facility into compliance, and if Purchaser fails to do so within the time period set forth in the notice (not to exceed one hundred twenty (120) days after receipt of such notice), the Retail Facility shall be deidentified by Purchaser. In the event a Retail Facility is abandoned, unoccupied or not operated for a period of sixty (60) consecutive days, Purchaser must notify Seller of such event and will immediately deidentify the Retail Facility, and notify, Seller of such deidentification. Deidentification shall include the removal of all of Texaco's Identification from the Retail Facility, automotive equipment, building and property, the painting over of identifying Texaco colors and the faded imprint or outline of Texaco lettering or other Identification that may exist on the building or canopy and the removal of graphics from the spreader bar. All deidentification expenses shall be borne by Purchaser. If Purchaser does not immediately deidentify the Retail Facility, Seller may, in addition to any other rights it has, enter the Retail Facility and cause the removal for Purchaser's account. Such deidentification shall not affect Seller's right to terminate or nonrenew this Agreement.

E. In the event that a Retail Facility is temporarily closed, Purchaser shall cover the "Primary Identification" sign and high rise if applicable, cover the stars and letters on the canopy, and keep the location clean and maintained.

F. Purchaser shall not sell non-Texaco brand motor fuels under the trademarks or brand names of Texaco. Purchaser shall offer, sell or resell Texaco-branded motor fuels only under the trademarks or brand names of Texaco.

G. Neither the execution of this Agreement by Seller, the authorization to identify the Retail Facilities pursuant to this Section 12, nor any prior course of dealing between the parties shall be construed as a grant of an exclusive territory to Purchaser for the marketing of any of Seller's products, or as a restriction upon the right of Seller to market its products to any purchasers in any area in any manner it chooses, including through its own retail facilities, except as otherwise provided in a Key Site Agreement, if any.

H. Purchaser shall submit all promotional materials and advertising to be used by Purchaser which bear any of Texaco's Identification to Seller for Texaco's prior written approval, unless such promotional materials and advertising have been approved for the particular use on a prior occasion or consist solely of materials provided by Texaco.

13.   TRAINING REQUIREMENTS

A. Purchaser shall attend and participate in the following types and hours of training programs as Texaco may develop from time to time relating to petroleum marketing at the Retail Facilities and associated operations. Texaco shall have the right to alter or amend such training requirements at any time, upon written notification to Purchaser.

i. Purchaser shall attend a minimum of sixteen (16) hours of training per contract year in such areas as customer service, operating standards, brand management, retail management,

business management or other cirriculum as approved by Texaco throughout the term of this Agreement. For the first contract year, Purchaser shall attend and participate in Texaco's training sessions consisting of Customer Service training and any other training approved by Texaco.

      ii. For all operators of Retail Facilities which are approved for branding by Texaco prior to July 1, 1998, such operators shall attend and participate in a minimum of sixteen (16) hours of training provided by Texaco, consisting of Customer Service training and any other training approved by Texaco.

      iii. For all operators of Retail Facilities seeking approval for branding by Texaco on or after July 1, 1997, as a pre-requisite to such Retail Facilities being approved for branding, such operators shall attend and participate in a minimum of sixteen (16) hours of training provided by Texaco, consisting of Customer Service training and any other training approved by Texaco.

      iv. All cashiers, service assistants, island attendants and other personnel at the Retail Facility (the "Personnel") shall view such training video tapes or other training materials pertaining to customer service, operations and Texaco marketing activities as Seller shall furnish to Purchaser and the Retail Facility. All personnel hired after July 1, 997 shall view such materials within thirty (30) days of hiring. New video tapes or updates of current video tapes shall be viewed by all Personnel within thirty (30) days of the date such materials are furnished by Seller. Purchaser shall cause the operators of the Retail Facilities to maintain an accurate record of Personnel viewing such materials for three (3) years from the date of such viewing and shall provide such record to Seller upon request.

    B. All such training programs provided by Texaco shall be held at such training sites or via such other remote methods as designated by Texaco. Should Texaco provide a "train-the-trainer" program, Purchaser may use such program to meet the above described training obligations at Purchaser's location. The costs of such training shall be in accordance with Texaco's currently published Retail Training Menu. Purchaser shall be responsible for all costs of food, lodging and travel to and from the training sites.

14.    CUSTOMER COMPLAINTS.

    Purchaser shall promptly respond to (in writing if requested by Texaco) to any inquiries or complaints received by Purchaser or Seller in connection with Purchaser's performance or the acts of any resale customer or consumer served by Purchaser and Purchaser take reasonable action to correct or satisfactorily resolve each such inquiry or complaint. If in Seller's judgment Purchaser fails to adequately respond to and correct or resolve customer inquiries or complaints, Seller shall have the right but not the obligation to resolve such matter directly with customer, at Purchaser's expense.

15.    CREDIT CARDS.

    Purchase agrees to execute and to cause the operators of its Retail Facilities to comply with the Texaco Wholesale Marketer Credit Card Agreement, Form S-452W, and such other agreements between Seller and Purchaser (and any special instructions relative to credit card transactions issued by Texaco from time to time. Purchaser shall be responsible for any breaches of the Texaco Retailer Credit Card Agreement, other such agreements, and related instructions from Texaco.

16.    FORCE MAJEURE.

    A. Unless otherwise expressly provided for in this Agreement, failure (in whole or in part) or delay on the part of either party in the performance of any of the obligations imposed upon such party under this Agreement shall be excused and such party shall not be liable for damages or otherwise, when such failure or delay is the direct or indirect result of any of the following causes, whether or not existing or reasonably within the contemplation of the parties on the Effective Date, namely: acts of God, earthquakes, fire, flood, or the elements, malicious mischief, insurrection, riot, strikes, lockouts, boycotts, picketing, labor disturbances, public enemy, war (declared or undeclared), compliance with any federal, state or local law, or with any regulation, order, rule, recommendation, request or suggestion (including, but not limited to, priority, rationing or allocation orders or regulations) of governmental agencies, or authorities or

representatives of any government (foreign or domestic) acting under claim or color of authority, total or partial failure or loss or shortage of all or any part of transportation facilities ordinarily available to and used by a party in the performance of the obligations imposed by this Agreement, whether such facilities are such party's own or those of others; and, if failure or delay be that of Seller, total or partial loss or shortage of raw or component materials or products ordinarily required by Seller, uncertainties in the supply/demand situation (which may include a decision by Seller that the costs of some crude oil and petroleum products which might be available are unreasonable), the commandeering or requisitioning by civil or military authorities of any raw or component materials, products or facilities, and perils of navigation, even when occasioned by negligence, malfeasance, defaults or errors in judgment of the pilot, master, mariners or other servants of the ship's owner; or any cause whatsoever beyond the control of either party, whether similar to or dissimilar from the causes enumerated in this Section.

B. If by reason of any said causes, Seller is unable to meet the requirements of Purchaser (whether under contract or not), its failure in whole or in part to make deliveries to Purchaser, while delivering to others, shall not be a breach of this Agreement. In such event Seller may, but shall not be obligated to, prorate its available supply on any basis which, in Seller's sole judgment, is fair and reasonable, allowing for such priorities, as Seller deems appropriate.

C. Upon cessation of the cause or causes for any such failure or delay, performance shall be resumed, but such failure or delay shall not operate to extend the term of this Agreement nor obligate either party to make up deliveries or receipts, as the case may be.

D. Nothing contained in this Section shall excuse Purchaser from paying to Seller in a timely manner when due all sums to which Seller is entitled (whether or not such sums are owed under this Agreement).

17.   PRACTICALITY.

A. In the event Seller's capacity to perform as to all of its customers, including Purchaser, becomes impractical in Seller's reasonable judgment, Seller shall be relieved of it's obligation to perform hereunder and shall not be obligated to Purchaser by reason of any delay in performance in whole or in part except to the extent of providing motor fuels to Purchaser on the same allocation formula (to be solely determined by Texaco) as other purchasers in the same class of trade served from the same shipping point. Seller shall notify Purchaser in writing of its lack of capacity to perform hereunder. In such notice, Seller shall advise Purchaser the quantities, if any, Seller will be able to supply Purchaser in the foreseeable future. Within ten (10) days thereafter, Purchaser shall notify Seller whether it wishes to purchase such reduced quantities where Seller has advised that reduced quantities are available, otherwise this Agreement shall be suspended until Seller's capacity to perform, in Seller's judgment, is restored.

B. If Seller determines that it is unable to perform hereunder by reason of any federal, state, or local law or regulation, order, rule, recommendation, request or suggestion relating to priority, rationing or allocation of any product covered hereby, Seller may suspend this Agreement at any time on ten (10) days' notice to Purchaser until such time as Seller determines its ability to perform is restored. Nothing herein shall be construed to extend the contract period beyond the term of this Agreement or give rise to any cause of action by reason of any of the provisions of this Agreement. In the event this Agreement is suspended as herein provided, Seller shall not be obligated to make up shipments not made as a result of such suspension.

18.   PRODUCT CLAIMS.

Any claims for defect or variance in quality (including, but not limited to, Reid Vapor Pressure and unleaded motor fuel) or shortage in quantity shall be made, and Seller shall be notified and given an opportunity to inspect, within seven (7) after the motor fuels or products are delivered to Purchaser at the shipping points designated pursuant to this Agreement. All records and documentation proving such defect, variance or shortage shall be retained by Purchaser and provided to Seller. Terminal meter measurements shall be considered correct absent conclusive, verifiable evidence that they are in error.

Failure of Purchaser to comply with these requirements shall operate as a waiver of any and all claims for defect, variance or shortage by Purchaser.

19.   COMPLIANCE WITH LAWS.

Purchaser shall comply fully and require its Retail Facility to comply fully with all applicable laws, regulations, judicial and administrative orders, and guidelines of any governmental authority, including without limitation (1) all requirements of the Americans With Disabilities Act, 42 U.S.C. 12101 et seq., and the regulations promulgated thereunder, (2) the requirements of the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq., and the regulations promulgated thereunder, and (3) the Clean Air Act, 42 U.S.C 7401 et seq., and regulations promulgated thereunder, and any other federal, state and local environmental laws, and the regulations promulgated thereunder, relating to or governing the recovery of vapors, octane and other labeling requirements, segregation, storage and resale of unleaded gasolines, and any laws, rules and regulations governing the sale of diesel fuel, reformulated gasolines and maximum allowable Reid Vapor Pressure. Purchaser shall ensure that no products purchased under this Agreement are stored into tanks which do not have current registrations or are not in compliance with monitoring requirements as required by applicable federal, state of local regulations.

20.   GOVERNMENTAL PRICE CONTROLS.

If Seller's right to charge or receive any price payable, or to revise any such price as provided in this Agreement, is restricted or prohibited by law, regulation or order of any governmental authority, Seller may, from time to time and upon thirty (30) days' notice to Purchaser, terminate the provisions of this Agreement insofar as they apply to the product(s) or the price(s) which are so restricted or prohibited. Upon the expiration of the thirty (30) days, it is understood that any such product(s) shall be deemed deleted from this Agreement, but that this Agreement shall otherwise continue to remain in full force and effect.

21.   TAXES.

A. Purchaser shall be responsible for the payment of all federal, state and local taxes, licenses, fees and/or duties, including but not limited to: gross receipts taxes, occupation taxes, motor fuel taxes, sales and use taxes, franchise taxes, income taxes, ad valorem taxes, property taxes, inspection fees, license fees, and all other taxes, fees and licenses arising from the purchase, sale, transfer or disposition, holding for sale/transfer/disposition, transportation of or use of the Texaco-branded motor fuels covered by this Agreement. Should any government authority require Seller to pay taxes, penalties or interest which under this Agreement are the responsibility of Purchaser, Purchaser agrees to reimburse Seller for all amounts so paid by Seller. Purchaser agrees to pay taxes as billed on an invoice by invoice basis.

B. If any federal, state or local law authorizes Purchaser to purchase the Texaco-branded motor fuels covered by this Agreement without the payment of federal, state or local taxes, Purchaser agrees to furnish Seller evidence satisfactory to Seller of such authority. Until Purchaser presents Seller with acceptable evidence of such authority, Seller shall be entitled to bill Purchaser for all applicable taxes.

22.   ASSIGNMENT, DELEGATION AND SUCCESSION.

A. It is the intention and understanding of the parties that this Agreement is personal to the Purchaser. If Purchaser is a business entity, all obligations and duties of a personal nature shall apply as if such business entity were an individual, and shall also apply to the extent legally possible and reasonably practicable to those individual persons who have or exercise management responsibility for such business entity. Purchase may sell, assign, transfer, merge or otherwise dispose of Purchaser's interest in this Agreement in whole or in part only upon the prior written consent of Seller. Purchaser may delegate the performance of the terms and conditions of this Agreement to another only upon the prior written consent of Seller. The consent of Seller required under this Section 22 cannot be waived except in writing. Any such purported sale, assignment, transfer, merger, disposition or delegation of Purchaser's interest and/or

performance of the terms and conditions of this Agreement, without such prior written consent, shall be null and void, and not binding on Seller.

B. It is further understood and agreed that if a sale, assignment, transfer, merger, disposition or delegation is made with Seller's prior written consent, Seller can require that all transferee owners of any share or interest in such business entity shall agree to be jointly and severally personally liable to perform all of the obligations of Purchaser.

C. Notwithstanding the foregoing, in the event of the death of or the suffering of continuing severe physical or mental disability of at least three (3) months duration by the individual currently in "control" of the ownership interest of Purchaser and to have or exercise management responsibility) which renders Purchaser unable to perform all of its obligations under this Agreement, Seller consents to the sale, assignment, transfer, merger or other disposition of Purchaser's interest in this Agreement and to the delegation of performance of the terms and conditions of this Agreement in whole or in part to a member of the individual's immediate family which shall consist of the individual's spouse, adult child, parent, brother and sister.

D. Subject to any requirements in applicable federal or state law, Seller may freely assign this agreement.

23.  INDEMNITY AND HOLD HARMLESS.

A. "INDEMNIFIED PARTY" OR "INDEMNIFIED PARTIES" MEANS SELLER, ITS PARTNERS, AFFILIATE AND SUBSIDIARY COMPANIES, AND THE RESPECTIVE PARTNERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF THE FOREGOING.

B. "DAMAGES" MEAN ALL CLAIMS, DEMANDS, CAUSES OF ACTION, SUITS, DAMAGES, PERSONAL INJURY, DISEASE OR DEATH OF ANY PERSON, LOSS OF PROPERTY OR BUSINESS VALUE OF ANY KIND, ECONOMIC INJURY, MONETARY DAMAGES, SPECIFIC PERFORMANCE OWED TO ANY THIRD PARTY, LIABILITIES, FINES, PENALTIES, ASSESSMENTS, ENVIRONMENTAL RESPONSIBILITY COSTS OR INJUNCTIVE OBLIGATIONS, JUDGMENTS, LOSSES AND REASONABLE EXPENSES (INCLUDING WITHOUT LIMITATION EXPENSES, COSTS OR ATTORNEY'S FEES INCURRED FOR ANY INDEMNFIED PARTY'S PRIMARY DEFENSE OR FOR ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS.

C. PURCHASER, TO THE MAXIMUM EXTENT PERMITTED BY LAW, SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS INDEMNIFIED PARTIES FROM AND AGAINST ANY DAMAGES WHICH MAY BE INCURRED OR ASSERTED AGAINST ANY INDEMNIFIED PARTY CAUSED BY, ARISING OUT OF, OR IN ANY WAY INCIDENTAL TO OR IN CONNECTIN WITH PURCHASER'S PERFORMANCE HEREUNDER, INCLUDING BUT NOT LIMITED TO ANY DAMAGES RELATING TO THE SAFETY OR SECURITY OF THE RETAIL FACILITY, OR WITH THE PERFORMANCE, ACTS OR OMISSIONS BY ANY CONSUMER SERVED BY PURCHASER (INCLUDING EMPLOYEES, AGENTS, CONTRACTORS AND INVITEES OF PURCHASER AND PURCHASER'S CONSUMERS).

D. PURCHASER, TO THE MAXIMUM EXTENT PERMITTED BY LAW, SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE INDEMNIFIED PARTIES FROM AND AGAINST ANY DAMAGES WHICH MAY BE INCURRED BY OR ASSERTED AGAINST ANY INDEMNIFIED PARTY ARISING OUT OF THE PURCHASER'S SALE, OFFER FOR SALE, OR DISPENSING, OF TEXACO-BRANDED GASOLINE OR DIESEL FUEL WHICH IS NONCOMPLIANT WITH ANY LEGALLY APPLICABLE STANDARD, OR ARISING OUT OF THE STORAGE OF A REGULATED PRODUCT INTO AN UNREGISTERED TANK, AN IMPROPERLY REGISTERED TANK OR A TANK NOT IN COMPLIANCE WITH APPICABLE FEDERAL, STATE OR LOCAL REGULATIONS.

E. IT IS THE INTENTION OF THE PARTIES THAT INDEMNITY OBLIGATIONS OF PURCHASER ARE WITHOUT REGARD TO WHETHER THE NEGLIGENCE, FAULT OR STRICT LIABILITY OF AN INDEMNIFIED PARTY IS A CONCURRENT OR CONTRIBUTORY FACTOR, AND SUCH OBLIGATIONS ARE INTENDED TO PROTECT THE INDEMNIFIED PARTIES AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE, FAULT OR STRICT LIABILITY. ONLY THOSE MATTERS WHICH ARE THE RESULT OF THE SOLE NEGLIGENCE OR FAULT OF AN INDEMNIFIED PARTY OR DEFECTS IN SELLER'S PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY THE NEGLIENCE OR FAULT OF PURCHASER OR PURCHASER'S EMPLOYEES, AGENTS, CONTRACTORS, INVITEES OR CONSUMERS SHALL BE EXCLUDED FROM PURCHASER'S DUTY TO INDEMNIFY AND HOLD HARMLESS THE INDEMNIFIED PARTIES. SUCH DUTY TO DEFEND AND PROTECT THE INDEMNIFIED PARTIES SHALL INCLUDE, WITHOUT LIMITATION, REASONABLE INVESTIGATION AND COSTS OF DEFENSE AND SETTLEMENT, INCLUDING REASONABLE ATTORNEY'S FEES UP THROUGH FINAL APPEAL OF TRIAL COURT JUDGMENT OR ARBITRATION. SELLER EXPRESSLY RESERVES THE RIGHT TO PARTICIPATE IN ITS DEFENSE, INCLUDING INVESTIGATION AND COSTS OF DEFENSE, WITH COUNSEL OF ITS OWN CHOOSING ALL AT ITS SOLE EXPENSE (SO LONG AS PURCHASER IS COMPLYING WITH ITS OBLIGATIONS TO SELLER AS STATED ABOVE). PURCHASER'S INDEMNITY OBLIGATIONS SHALL SURVIVE THE EXPIRATION, TERMINATION OR NONRENEWAL OF THIS AGREEMENT.

F. PURCHASER'S INDEMNITY OBLIGATIONS SHALL NOT LIMIT AND SHALL NOT BE LIMITED BY THE INSURANCE REQUIREMENT'S (INCLUDING WITHOUT LIMITATION SELLER'S ADDITIONAL INSURED STATUS) SET FORTH IN THE INSURANCE AND FINANCIAL COMPLIANCE REQUIREMENTS SECTION.

24    INSURANCE AND FINANCIAL COMPLIANCE REQUIREMENTS.

A. Purchaser shall maintain, at its sole cost, at all times while performing under this Agreement, the following insurance coverage and financial guarantees with providers satisfactory to Seller with limits not less than but not limited to those limits set forth below (the "Insurance"):

i. Commercial General Liability Insurance unamended or Comprehensive General Liability Insurance with a Broad Form CGL endorsement with limits of not less than $1,000,000 each occurrence and $1,000,000 general aggregate. Purchasers owning, leasing or operating up to and including three (3) locations are subject to the minimum limits above. Purchasers owning, leasing or operating up to and including five (5) locations shall amend their policy aggregate to not less than $3,000,000. Purchasers owning, leasing or operating six (6) or more locations shall amend their policy aggregate to not less than $5,000,000. In lieu of amending aggregate limits as described herein, endorsement CG 2504 amending limits per location may be utilized when applied to the above-described minimum limits. Limits excess of $1,000,000 may be provided by Excess Liability or Umbrella Liability coverage.

- Liquor Liability Insurance must be included for those locations which are owned, leased or operated by Purchaser engaged in the sale of alcoholic beverages

- Purchasers operating marine facilities shall have Marine Terminal or Wharfingers Liability Insurance. Purchasers supplying marine facilities via watercraft shall have the watercraft exclusion deleted or purchase equivalent coverage.

ii. Business Automobile Liability Insurance covering all vehicles used in the operations of the Purchaser with limits of liability of not less than: Bodily Injury $1,000,000 each person, $1,000,000 each accident; Property Damage $1,000,000 or a Combined Single Limit of $1,000,000 for bodily injury and property damage, such policy to be endorsed with MSC-90 when hazardous material transportation is involved.

iii. Worker's Compensation Insurance and/or Longshoremen's and Harborworkers' Compensation Insurance as required by laws and regulations applicable to and covering employees of Purchaser performing under this Agreement.

iv. Employer's Liability Insurance protecting Purchaser against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of not less than $500,000 each accident, $500,000 Disease-Policy Limit, $500,000 Disease- each employee.

v. Purchasers owning, leasing or operating Underground Storage Tank systems (as defined in applicable federal and state laws and regulations, and hereinafter referred to as ("UST's"), shall comply with all applicable federal, state and local laws, regulations and ordinances governing UST's (hereinafter referred to as (Laws"), including but not limited to financial responsibility requirements of such Laws for UST's through mechanisms provided for in said Laws such as, by way of example, guarantees, surety bonds, insurance and state reimbursement funds.

vi. Garage Insurance with limits of not less than $1,000,000 each occurrence and Garagekeeper's Legal Liability Insurance with a limit of not less than $50,000 each occurrence. (Only required for those locations engaged in automotive repairs.)

In accordance with the law, Insurance policies shall allow for the separation of insureds and give written notice of cancellation or material change. Notice of cancellation or change shall not affect the Insurance until thirty (30) days after written notice is received by Seller. Any deductible or retention of insurable risks shall be for the Purchaser's account.

B. The Insurance required in this Section and each certificate evidencing the Insurance issued to Purchaser shall name Seller (and its partners to the extent of their interest in Seller) an additional insured (except for Subsections (A)(ii-v)) without regard to the allocation of liability provisions contained in this Agreement, to the extent of any claim, loss or liability within the scope of the required insurance. It is the intention of the parties that the status of Seller ( and its partners to the extent of their interest in Seller) as an additional insured shall not be limited.

C. Failure of Purchaser to provide certificates evidencing the requirements or purchase insurance coverage in compliance with this Section shall not relieve Purchaser of its obligations in this Section. Failure of Purchaser to comply with this Section during this Agreement shall constitute a breach of this Agreement, and Seller shall have the right, in addition to any other rights, to immediately cancel and terminate this Agreement without further cost to Seller.

25.   NOTICE.

Notices from Seller to Purchaser shall be considered as properly given if personally delivered in writing to Purchaser or its place of business stated herein, or if placed in the United States mail, postage prepaid, addressed to Purchaser's place of business stated herein. Notices from Purchaser to Seller shall be considered properly given if placed in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Seller's place of business stated herein. The postmark date shall be date of any notice sent by United States mail.

26.   WARRANTIES AND DISCLAIMERS.

A. SELLER WARRANTS THAT ALL MOTOR FUELS SOLD TO PURCHASER UNDER THIS AGREEMENT SHALL MEET TEXACO'S THEN CURRENT SPECIFICATIONS PURCHASER SHALL NOTIFY SELLER OF ANY CLAIM OF VARIANCE OF TEXACO'S SPECIFICATIONS IN ACCORDANCE WITH SECTION 19 ABOVE, AND SELLER SHALL HAVE AN OPPORTUNITY TO INSPECT AND INVESTIGATE AT ANY TIME THEREAFTER. FAILURE OF PURCHASE TO NOTIFY SELLER OR COOPERATE IN ANY INVESTIGATION SHALL OPERATE AS A WAIVER OF ANY AND ALL CLAIMS BY THE PURCHASER HEREUNDER.

B. SELLER MAKES NO OTEHR WARRANTIES OF ANY KIND AS TO THE MOTOR FUELS SOLD TO PURCHASER UNDER THIS AGREEMENT, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THIS AGREMENT EXPLICITLY REPRESENTS THE TRUE INTENTIONS OF THE PARTIES WITH RESPECT TO THE MATTERS HEREIN EXPRESSED AND BOTH PARTIES HEREBY WAIVE ANY IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

27.    LIMITATION OF DAMAGES.

    With the exception of actions brought by Seller to enforce its rights under Sections 6, 7, 12, neither party shall be liable for any indirect, special, incidental, consequential or punitive damages, to the extent such limitation is permitted under applicable law, whether under tort, contract, strict liability, statute or otherwise.

28.    RESERVATION OF RIGHTS.

    This Agreement shall be governed by and construed in accordance with the terms of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq. As amended from time to time, cases decided under the Act, and any successor Act. Each party expressly reserves all rights under the Act. No omission in this Agreement of any reference to any specific right under the Act shall constitute a waiver of such right.

29.    ENTIRETY.

    This Agreement is intended by the parties to be the final, complete and exclusive embodiment of their agreement about the matters covered in this Agreement, and as of the Effective Date supersedes and terminates any existing Wholesale Marketer Agreement for Motor Fuels. No prior stipulation, agreement or understanding of the parties, their employees or agents, whether oral or in writing, shall be valid or enforceable. This Agreement may not be altered, amended or changed in any way except a written instrument executed by both parties.

30.    WAIVER.

The right of either party to require strict performance by the other of any or all obligations imposed upon the other by this Agreement shall not in any way be affected by any previous waiver, forbearance or course of dealing.

Agreement prior to such approval and signing shall in no case be construed as a waiver by Seller of the above requirement.

PRICE OIL, INC.
(Seller)

Witness: _Ben C. Tamburelly_

By: _Todd Tranty_
Title: _C.E.O._
Date: _1/9/02_

_James M. McCullers_
_Staci McCullers_
(Purchaser)

Witness: _Ben C. Tamburelly_

By: _James M. McCullers_
Title: _Owner / operator_
Date: _1/14/02_

**EXHIBIT A**
**PURCHASE QUANTITY SCHEDULE**

Date: 1/4/67

Attached to and made a part of Price Oil, Inc. Marketer Agreement For Motor Fuels.

Unless otherwise indicated below, the approximate monthly quantities of Texaco motor gasoline and Texaco diesel fuel shall be 1/12th (one-twelfth) of the annual minimum and maximum quantities.

---

**TEXACO MOTOR GASOLINE**

**\*Minimum Yearly Quantities**

Total Annual Minimum    600,000
Total Annual Maximum    _____

Approximate Monthly Quantities (Gals.)

| Month | Minimum | Maximum | Month | Minimum | Maximum |
|-------|---------|---------|-------|---------|---------|
| JAN   |         |         | JUL   |         |         |
| FEB   |         |         | AUG   |         |         |
| MAR   |         |         | SEP   |         |         |
| APR   |         |         | OCT   |         |         |
| MAY   |         |         | NOV   |         |         |
| JUN   |         |         | DEC   |         |         |

---

**TEXACO DIESEL FUEL**

Total Annual Minimum    N/A
Total Annual Maximum    _____

Approximate Monthly Quantities (Gals.)

| Month | Minimum | Maximum | Month | Minimum | Maximum |
|-------|---------|---------|-------|---------|---------|
| JAN   |         |         | JUL   |         |         |
| FEB   |         |         | AUG   |         |         |
| MAR   |         |         | SEP   |         |         |
| APR   |         |         | OCT   |         |         |
| MAY   |         |         | NOV   |         |         |
| JUN   |         |         | DEC   |         |         |

**ADDENDUM TO S-452W**

**CRDIT CARD IMPRINTER**

The undersigned acknowledges receipt _____ Credit Card imprinters and agrees to pay Price Oil, Inc. for each imprinter **$36.00** plus tax per year. All imprinters remain the property of Texaco. Purchaser agrees to notify Price Oil, Inc. of closure or change in status of any retail facility within sixty (60) days and to return the imprinter within ninety (90) days of closure. In the event of loss, theft, or damage beyond repair of any imprinter entrusted to me by Price Oil, Inc., I agree to pay Price Oil, Inc. the sum of **$325.00** for each imprinter.

WITNESS:

Date Signed: _____1/14/02_____

BY: _____
Dealer
Date Signed: _____1/14/02_____

**ADDENDUM TO S-452W (JV)**
**TRANSACTION AUTHORIZATION FEES**

1.     Approved POS terminal locations:

| | |
|---|---|
| Texaco fuels sales | 0% |
| Texaco non-fuel sales | 3% |
| Visa | 3% |
| Master Card | 3% |
| Discover Card | 3% |
| Diners Club / Carte Blanche | 3% |
| Approved Competitive Oil Cards | 3% |
| API (universal cards) | 3.5% |
| Wright Express | 3.5% |
| American Express | 4% |
| Debit Card | $0.20 / transaction |
| Federal Government / State Cards | 3.5% |
| Voyager Card | 3% |

2.     Non-qualifying POS terminal locations:

| | |
|---|---|
| All Credit Card transactions | 3% |

3.     Non-POS terminal locations:

| | |
|---|---|
| All paper transactions | $0.75 / transaction |

Texaco reserves the right to change the transaction authorization fees listed above upon providing Dealer at least thirty (30) days prior written notice.

## PRICE OIL, INC. DEALER CREDIT CARD AGREEEMENT FOR TEXACO DEALERS

Price Oil, Inc. ("Price") having offices at 700 Oliver Road, Montgomery, AL 36117 and
_James M. McCullers & Staci L. McCullers_ ("Dealer"), whose place of business is
located at _13090 C.L. Torbert JR. Prway LAFEYETTE AL 36852_ make the following Price
Oil, Inc. Dealer Credit Card Agreement For Texaco Dealers, hereinafter called the Agreement.

1.  **Duration of Agreement.** This Agreement shall commence on the _14th_ day of _January_
    _2007_, (the "Effective Date") and expire on the _14th_ day of _January, 2012_,
    unless earlier terminated as provided in this Agreement. This Agreement shall terminate
    automatically upon the termination, expiration, or nonrenewal of the S-175A Price Oil, Inc.
    Wholesale Dealer Agreement for Motor Fuels.

2.  **Authorized Credit Card Transactions.** Price grants to Dealer and the Texaco-branded retail
    facility Dealer owns, operates or otherwise serves ("Retail Facility") the privilege of honoring, and
    Dealer and Retail Facility shall accept and honor, valid Texaco Credit Cards or other valid credit
    or debit cards, if any, authorized by Star at the time of the Sale (collectively "Credit Cards") for all
    products (including convenience store merchandise and quick service restaurant ("QSR") products)
    and services customarily offered at retail facilities to the motoring public, as more specifically
    detailed in booklet Form S-452, "Information on the Handling of Texaco Credit Card
    Transactions" as it may be revised from time to time ("S-452 Information Booklet"). The
    authorization granted Dealer and Retail Facility is subject to all of the restrictions set forth in the
    S-452 Information Booklet, which is hereby incorporated by reference as if set forth fully herein.
    In the event of conflict between this Agreement and the S-452 Information Booklet, the provisions
    of the S-452 Information Booklet shall control.

    2.1  Credit Cards other than Texaco Credit Cards may be honored only in accordance with
         special written authorization issued to Dealer and Retail Facility by Texaco from time to
         time.

    2.2  Price reserves the right to revoke the privilege of honoring Credit Cards at any time.
         Dealer shall comply and shall cause Retail Facility to comply with this Agreement, any
         other agreements between Dealer and Price, and any special or supplemental instructions
         relative to Credit Card transactions issued by Texaco from time to time. Dealer shall be
         responsible for any breaches by the operators of its Retail Facility of this Agreement,
         other such agreements and related instructions from Texaco.

3.  **Electronic Transactions.** Except as otherwise provided in this Agreement, all Credit Card
    transactions must be processed electronically both through point of sale equipment and through
    point of sale network(s) which are approved by Texaco in its sole discretion. Dealer shall install
    and maintain, including upgrades to the latest version of available software as required by Texaco,
    point of sale equipment at the Retail Facility. Price hereby grants Dealer access to the approved
    point of sale network(s) as approved by Texaco for such Dealer. Usage of the point of sale
    network in any manner inconsistent with this Agreement or any tampering or attempt to distort,
    alter or otherwise improperly manipulate the point of sale equipment or point of sale network shall
    be cause for termination of this Agreement.

    3.1  Credit Card transactions may be manually processed in the following instances:

         (a)  A credit card which cannot be electronically processed because f physical defect
              such as a defective or missing magnetic strip;

         (b)  Transactions during a temporary "down-time" of the point of sale equipment for
              reasons including, without limitation, hardware or software problems, loss of
              communication, and power outages;

(c)     Selective cards listed in the S-452 Information Booklet which require special billing; or

(d)     When instructed by the point of sale equipment to use the manual imprinter.

3.2     When indicated by the point of sale equipment, or if the point of sale equipment is unable to process authorizations and the sales amount exceeds the amount designated in writing by Texaco, the sale must be authorized by telephoning the proper authorization center. The authorization number so obtained must be recorded on the invoice. A credit entry may be made on the point of sale equipment only to adjust for or void an incorrect sales entry made on the point of sale equipment.

3.3     Dealer shall be responsible for retaining all electronically generated sales reports (except receipts generated from island card readers) and records, including but not limited to signed copies of From S-199D (POS), for a period of not less than six (6) months. Price may, from time to time, request Dealer to provide necessary data (including signed copy of POS invoice) to satisfy inquiries or to verify electronic transactions.

4.     **Manual Transactions.**     When a Credit Card is to be processed manually; i.e., local imprinting of card onto paper invoices, the date shall be checked to be sure the card is currently valid. Approval shall be sought for credit sales of a certain dollar amount as designated by Texaco's special written notification by telephoning Texaco's Authorization Center, and if credit is approved, a record shall be made of the authorization code number furnished on the invoice in the space marked "Authorization Code". If the credit is disapproved, the facility shall be advised either to decline the credit or to pick up the Credit Card. Dealer agrees to pay Price an annual lease and maintenance charge for each imprinter furnished by Price to Dealer to handle manual transactions in accordance with the attached Credit Card Imprinter Addendum.

4.1     The imprinter and appurtenant plates, plastics, and Credit Card invoice forms are the party of Texaco, shall be accounted for by Dealer at all times, and may only be used for valid Credit Card transactions in accordance with this Agreement.

4.2     For manual handling of Credit Cards, after filling in the details of the transaction legibly with a ball point pen or pencil, the invoice and the purchaser's Credit Card must be inserted in the imprinter to imprint the Credit Card account number, the purchaser's name, the total amount of the transaction, the date and the Dealer identification plate on the invoice. The written and imprinted totals must agree or else the imprinted amount shall prevail. The customer must then sign the invoice for the products or services and confirm the accuracy of the complete invoice.

4.3     Invoices which have been manually imprinted should be submitted directly to Price for reimbursement in the manner prescribed by Price from time to time. **Debit card transactions cannot be processed manually.**

5.     **Price's Charge-back Rights.**     All credit card chargebacks shall be paid o Price as designated from time to time by Price in its sole discretion.

5.1     Price shall have the right to charge back to Dealer's account, within six (6) months of date of sale or within six (6) months of submittal, whichever is later, the face value or any portion thereof, any chargeback claimed against Texaco by a credit card issuer.

5.2     Failure by Price to charge back to Dealer any invoices or charges from time to time shall not operate as a waiver of Price's right thereafter to charge back any invoices or charges which may thereafter be submitted in violation of the provisions of this Agreement and shall not operate as a waiver by Price of its right to terminate this Agreement or any other contractual arrangements between Price and Dealer.

5.3    Texaco retains the right to implement any and all fraud prevention measures as Texaco in its sole discretion deems necessary, which shall include but not limited to, chargeback rights, purchase restrictions, card restrictions, card reader in dispenser (CRIND) restrictions, training, penalties, fines and other assessments.

6.    **Credit Card Transaction Authorization Fees and Reimbursement.** For services provided under this Agreement, Texaco shall receive (via deduction) a Credit Card transaction authorization fee as set forth in the attached Transaction Authorization Fees Addendum. Price will credit Dealer's account by credit memorandum, check or electronic fund transfer for the net amount of the invoices. Price reserves the right to change reimbursement arrangements at any time and shall have the right, in its sole discretion, to setoff or equitably recoup amounts due from Dealer; under this or any other agreement with Dealer, against any amounts owed to Dealer, up to the total amount outstanding.

7.    **Termination.** Price serves the right to terminate this Agreement immediately if Dealer fails to comply with any of the terms of the Agreement or any other agreement between Dealer and Price. This Agreement shall automatically terminate upon termination, nonrenewal or expiration of any other sales or lease agreement between Dealer and Price.

8.    **Independent Status of Dealer.** Dealer is an independent business entity and this Agreement shall not be deemed to reserve, give or grant to Price any right to manage or control Dealer's business.

8.1    Price has not and will not request and does not authorize any Dealer to accuse any person of a crime or to file any complaint, civil or criminal, against any person for or in Price's name arising out of any Credit Card or other transaction. Furthermore, Price does not authorize or condone any actin by a Dealer which is not peaceable. The instructions furnished by appropriate authorization centers in connection with Credit Card transactions are not intended in any way to represent that any person has violated any law or ordinance.

8.2    Dealer shall not take steps to make any accusations, file a complaint or otherwise cause the arrest of a customer without first consulting appropriate legal counsel.

9.    **Assignment, Delegation and Succession.** It is the intention and understanding of the parties that this Agreement is personal to the Dealer. Dealer may not sell, assign, transfer, merge or otherwise dispose of Dealer's interest in this Agreement in whole or in part or delegate the performance of the terms and conditions of this Agreement to another except as provided in the agreement under which Dealer buys motor fuels from Price.

<u>10.</u>    **No Franchise.** Dealer acknowledges that this Agreement does not create, extend, or renew a franchise under any local, state or federal law., including the Petroleum Marketing Practices Act, 15 U.S.C. 2801, <u>et seq</u>.

11.    **Limitation of Damages.** Neither party shall be liable for any indirect, special, incidental, consequential or punitive damages whether under tort, contract, strict liability, statute or otherwise.

12.    **Amendment.** Price reserves the right to unilaterally amend this Agreement at any time by giving Dealer at least thirty (30) days written notice of such amendment.

13.    **Waiver.** The right of either party to require strict performance by the other of any or all obligations imposed upon the other by this Agreement shall not in any way be affected by any previous waiver, forbearance or course of dealing. Failure by Price to charge back to Dealer any invoices from time to time shall not operate as a waiver of Price's right thereafter to charge back

any invoices which may thereafter be prepared in violation of the provisions of this Agreement and shall not operate as a waiver by Price of its right to terminate this Agreement or any other contractual arrangements between Price and Dealer.

14. **Severability.** If for any reason a provision or provisions contained in this Agreement are held to be invalid, illegal or otherwise void, the remaining provisions of this Agreement shall not affected and shall continue in full force and effect.

15. **Approval and Signing by Price.** This Agreement shall not be binding on Price until approved and signed on its behalf by a duly authorized officer or employee. Commencement of performance hereunder prior to such approval and signing shall in no case be construed as a waiver by Price of the foregoing requirement.

16. **Entirety.** This Agreement is intended by the parties to be the final, complete and exclusive embodiment of their agreement about the matters covered in this Agreement, and as of the Effective Date supersedes and terminates any existing Credit Card Agreement. No prior stipulation, agreement or understanding of the parties, their employees or agents, whether oral or in writing, shall be valid or enforceable.

WITNESS:

Price Oil, Inc.,

BY: _____
Todd Armstrong
Title: C.E.O
Date Signed: 1/9/02

WITNESS:

BY: _____
Dealer
Date Signed: 1/14/02

Exhibit A to the Wholesale Brand and Sales Agreement

## Columbus, Ga.
## Supply Agreement:

Texaco Net Terminal Rack Price Plus Freight Costs Plus .022cpg Plus Applicable Taxes and Fees on each Gallon of Gasoline and Diesel Fuel Delivered. In the event a temporary Fuel surcharge is implemented by the Common carriers, then Price Oil, Inc. Is entitled to pass on such fuel Surcharge.

Terms/Payments

NET 7 Days EFT

Customer will Pay:

All monthly and annual fees related to The acceptance of the brand's credit Card network.

Price Oil, Inc. will Provide:

1.) Proof of invoicing to validate Billing for product delivered.
2.) Marketing assistance upon request of the Dealer.

_signature_

_signature_

OWNER

_signature_

Todd Armstrong
C.E.O.
Price Oil, Inc.

_signature_

Witness

1/9/02

Date

1779

Exhibit A to the Wholesale Brand and Sales Agreement

Columbus, Ga.
Supply Agreement:

~~Texaco Net Terminal Rack Price Plus Freight Costs Plus .022cpg Plus~~ Applicable Taxes and Fees on each Gallon of Gasoline and Diesel Fuel Delivered. In the event a temporary Fuel surcharge is implemented by the Common carriers, then Price Oil, Inc. Is entitled to pass on such fuel Surcharge.

Terms/Payments              ~~NET 7 Days EFT~~

Customer will Pay:          All monthly and annual fees related to The acceptance of the brand's credit Card network.

Price Oil, Inc. will
Provide:                    1.) Proof of invoicing to validate Billing for product delivered.
                            2.) Marketing assistance upon request of the Dealer.

OWNER                       Todd Armstrong
                            C.E.O.
                            Price Oil, Inc.

Witness                     Date  1/9/02

# AGREEMENT TO AMEND EXISTING
## WHOLESALE BRAND AND SALES AGREEMENT

This agreement made and entered into this _1 8_ day of _____ _March_ _____, 200__ by and Between PRICE OIL. INC., an Alabama corporation, with its general offices at P. O Drawer 210249, Montgomery, AL 36121-0249 (hereinafter called "Price") and _____ with his retail sales facility located at 13090 CL Torbert Parkway, Lafayette, AL, (hereinafter called "Dealer"). Price and Dealer are sometimes collectively referred to as "the Parties" hereinafter.

The parties hereby agree, for new, good and valuable consideration to one another given and received, to amend the certain Wholesale Brand and Sales Agreement ("Wholesale Agreement") currently in effect between them as set forth and conditioned below:

To-Wit: The Parties acknowledge that there exists in effect between them currently a Wholesale Brand and Sales Agreement which is hereby referenced and fully incorporated herein with the exception of mutually agreed-upon changes set forth below. The parties acknowledge that such Wholesale Agreement provides for the supply of TEXACO branded motor fuel from Price to Dealer. The parties acknowledge that because of marketing decisions made by third parties, namely TEXACO, TEXACO branded motor fuel shall at some future date no longer be made available for retail sale and that no retail stations shall be capable of maintaining the TEXACO brand or its trademarks. The parties acknowledge that TEXACO branded fuel and TEXACO branded stations shall be required to transfer to the SHELL brand as a result of such marketing changes.

The parties acknowledge that certain stations currently branded TEXACO shall be able to receive SHELL branded fuel and the SHELL brand trademarks. The parties acknowledge that Price is a certified jobber for TEXACO and SHELL branded fuels and Dealer is eligible to participate in the conversion of its fuel supply and station(s) branding and trademarks from the TEXACO brand to the SHELL brand under the following conditions:

1. The Wholesale Agreement shall remain in full force and effect, including all personal and corporate guarantees and other addenda thereto (excepting the repayment schedule for personal and corporate "Image and Incentive Guarantee Agreements", which shall be deemed revised as set forth below at No. 4). and also except as follows:

2. The TERM of said Wholesale Agreement shall be for TEN (10) years, effectively beginning MAY 1, 2003 and expiring MAY 1, 2013. This Agreement to Amend shall be deemed to govern any and all stations presently governed by the Wholesale Agreement. All applicable existing guarantees and addenda shall be deemed to remain in full force and effect for the duration of said term (excepting the repayment schedule for personal and corporate "Image and Incentive Guarantee Agreements", which shall be deemed revised as set forth below at No. 4).

3. Price shall bear the costs of converting the station(s) to bring them into compliance with the standards applicable to a SHELL branded location. Such conversion responsibility shall be limited to outdoor color schemes, including canopy and painting schemes.

NO
4. Dealer shall pay ~~an additional one cent ($.01) per gallon~~ MARKUP on both gas and diesel fuel, in addition to any already-applicable markups, taxes and freight.

5. Should Dealer cause the station(s), whether voluntarily or involuntarily, to lose or no longer use the SHELL brand at any time relevant to the new term set forth in No. 2, above, Dealer shall be liable to Price for the repayment of any costs paid by Price for the conversion of the station(s) to the SHELL brand in the manner set forth below:

| | |
|---|---|
| First through Fifth year from contract activation | 100% of incentive |
| Sixth year | 80% of incentive |
| Seventh year | 60% of incentive |

brand.

Agreed and entered into this the 18 day of _March_, 2003.

FOR DEALER:                           FOR PRICE OIL, INC.

BY:                                   BY:

WHOSE POSITION WITH DEALER IS: _Owner_

WITNESS

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602005288
Cashier ID: brobinso
Transaction Date: 05/29/2008
Payer Name: MCNEAL AND DOUGLAS
------------------------------------
CIVIL FILING FEE
 For: MCNEAL AND DOUGLAS
 Case/Party: D-ALM-3-08-CV-000406-001
 Amount:        $350.00
------------------------------------
CHECK
 Check/Money Order Num: 1840
 Amt Tendered:  $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

LAFAYETTE TEXACO ET AL V. MOORE OIL
CO ET AL